Hearing Date: March 28, 2017
Time: 9:30 a.m.
Objection Deadline: March 21, 2017
Hearing Location: Utica, New York

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

  FOLTS HOME, *et al.*,[1]

          Debtors.

Case No. 17-60139
Chapter 11 Cases
(Main Case)
Jointly Administered

### JOINT AFFIDAVIT OF ANTHONY E. PIANA, DDS AND JAMES H. MOREY IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND PURSUANT TO LOCAL RULE 2015-6

STATE OF NEW YORK )
COUNTY OF HERKIMER ) ss.:

  Anthony E. Piana, DDS and James H. Morey, being duly sworn, hereby depose and say:

  1.  Dr. Piana is the Chairman and a member of the Board of Directors of Folts Home and the Secretary and a member of the Board of Directors of Folts Adult Home, Inc. ("FAH"). Mr. Morey is the Chairman and a member of the Board of Directors of FAH and the Secretary and a member of the Board of Directors of Folts Home. Folts Home and FHA are, collectively, the "Debtors", and the debtors and debtors in possession in the captioned chapter 11 cases. In our capacities as officers and chairmen of the Debtors' Boards of Directors, we are fully familiar with the facts and circumstances set forth herein.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Folts Home (2183) and Folts Adult Home, Inc. (7237).

2.      We submit this Affidavit in support of the first day applications and motions filed by the Debtors on February 14, 2017 (the "Petition Date")[2] and in compliance with Local Rule 2015-6. Except as otherwise indicated, all facts set forth in this Affidavit are based upon our personal knowledge, our review of relevant documents, our opinions, our experience and knowledge of the Debtors' operations and financial conditions, or are based upon knowledge of employees of the Debtors reporting to us that are derived in the course of his/her duties. If we were called upon to testify, we could and would testify to the facts set forth herein. We are authorized on behalf of the Debtors to submit this Affidavit.

3.      Part I of this Affidavit describes the Debtors' businesses and the circumstances surrounding the filing of the Debtors' chapter 11 petitions. Part II of this Affidavit sets forth the relevant facts in support of the various first day applications and motions filed by the Debtors contemporaneously herewith.

## PART I – BACKGROUND

### A.  General Background

4.      On the Petition Date, the Debtors filed separate, voluntary petitions for relief under chapter 11 of title 11 of the United States Code, §§ 101, *et seq.*, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York.

5.      The Debtors remain in possession of their respective assets and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have filed an application with the Bankruptcy Court seeking joint administration of their cases.

---

[2] All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant motions.

2823158.1

6.    Folts Home is a New York not-for-profit corporation and the owner of a 163-bed long-term residential health care and rehabilitation facility located at 100-122 North Washington Street, Herkimer, New York 13350 (the "Nursing Home Facility"). The original Folts Home "mansion house" was owned and constructed by John A. and Catherine Folts on North Washington Street in 1867. In 1893, the property was transferred by the Folts family members to the Northern New York Conference of the Methodist Church and was used as an education institution by the Folts Mission Institute until 1927. The property was later renovated as a home for the aged, and in 1943, admitted its first resident. The current, five-story Folts Home building was constructed in 1962. In addition to long-term skilled nursing and residential care, Folts Home provides memory care to residents with dementia, palliative care and respite care and operates an adult day care program. Folts Home also offers rehabilitation services, such as physical, occupational and speech therapy, on both in-patient and out-patient bases.

7.    FAH, also known as Folts-Claxton, is a New York not-for-profit corporation and the owner of an 80-bed adult residential center that was constructed in 1998 and is located at 104 North Washington Street, Herkimer, New York 13350 (the "Adult Home Facility", and together with the Nursing Home Facility, the "Facilities"). FAH residents reside in separate apartments and are provided services such as daily meals, laundry, housekeeping and medication assistance.

8.    Folts Home and FAH currently have average daily censuses of 145 and 69, respectively. Folts Home has three (3) major payors: Medicare, Medicaid and commercial insurance. On a resident-day basis for 2016, these payors accounted for 5%, 70% and 12% of payments, respectively. The balance of payors is private pay. On an outpatient registration basis, Medicare/Medicaid and commercial insurance payors accounted for 50% and 50%,

3

2823158.1

respectively.  The majority of FAH residents are government subsidized, with 58% covered by Social Security Insurance and 42% private pay.

9.      Currently, Folts Home has approximately 218 active employees.  Approximately 124 of the employees are full-time, 60 are part-time and 34 employees are employed on a *per diem* basis.  FAH has approximately 22 active employees.  Approximately 12 are full-time employees and 10 are part-time employees.  None of Folts Home's or FAH's employees are represented by labor unions.

### B. <u>The HUD Mortgages</u>

### 1. <u>The Folts Home Mortgage</u>

10.      On or around February 25, 1993, Folts Home borrowed the original principal sum of $8,145,000.00 from the New York State Medical Care Facilities Finance Agency ("NYSMCFFA"), which loan was memorialized in a Mortgage Note in that amount executed and delivered by Folts Home to NYSMCFFA (the "Folts Home Note").  The Folts Home Note provided for monthly payments of principal and interest commencing on March 1, 1993 and continuing through July 1, 2023.  The Folts Home Note was thereafter modified by an Allonge dated December 28, 1994 and was later assigned to the New York State Dormitory Authority.

11.      Repayment of the obligation due under the Folts Home Note was secured by a first position mortgage lien covering the Nursing Home Facility and real property (the "Folts Home Mortgage") and a first position blanket security interest in all of Folts Home's assets (the "Folts Home Security Interest") in favor of NYSMCFFA.  The Folts Home Mortgage was duly recorded in the Herkimer County Clerk's Office on February 25, 1993 at Book 657 of Mortgages at Page 4.  A UCC-1 financing statement was duly recorded on February 25, 1993.  Repayment

2823158.1

of the amounts due under the Folts Home Loan was insured by the Secretary of the United States Department of Housing and Urban Development ("HUD").

12.    On or around January 10, 2006, the Folts Home Note was amended and refinanced, and the Folts Home Note and Folts Home Mortgage were assigned to GMAC Commercial Mortgage Corporation ("GMAC").  On or around December 9, 2009, GMAC, n/k/a Capmark Finance, Inc. (as debtor in possession), assigned the Folts Home Note, Mortgage and related loan documents to Berkadia Commercial Mortgage, LLC ("Berkadia").

13.    Folts Home defaulted on its obligations under the Folts Home Note as of February 2013, and has not made a payment since that date.

14.    On or around April 1, 2014, Berkadia assigned the Folts Home Note and Mortgage to Greystone Servicing Corporation, Inc. ("Greystone").

15.    On or around July 1, 2016, Greystone exercised its rights under the loan documents to request that HUD honor its insured guaranty of payment and satisfy the outstanding amounts due under the Folts Home Loan.  In exchange for that payment, Greystone assigned all of its rights and interests in the Folts Home Note, Mortgage and related documents to HUD on or around July 28, 2016.

16.    As of the Petition Date, the principal sum of $4,777,273.57 is due HUD under the Folts Home Note, plus interest and accrued fees totaling approximately $1,396,810.54, for a total indebtedness of approximately $6,174,084.11.  Under the terms of the Folts Home Note and Mortgage, HUD is in possession of funds previously paid by Folts Home into a Replacement Reserve Account totaling $112,070.06 and funds paid into a Sinking Fund Account totaling $1,314,117.25.

2823158.1

## 2. The Adult Home Mortgage

17.    On or around July 29, 1997, FAH borrowed the original principal sum of

$7,885,000.00 from Continental Securities Corp. ("Continental") under HUD's § 232 Loan

Program, which loan was memorialized in a Mortgage Note in that amount executed and

delivered by FAH to Continental (the "1997 Note").  The 1997 Note provided for monthly

payments of interest only from August 1, 1997 through January 1, 1999, then for payments of

principal and interest commencing on February 1, 1999 and continuing through January 1, 2039.

18.    The funds received under the 1997 Note were used to construct the Adult Home

Facility.  Repayment of the obligation due under the 1997 Note was secured by a first position

mortgage lien covering the Adult Home Facility and real property (the "1997 Mortgage") and a

first position blanket security interest in all of FAH's assets (the "1997 Security Interest") in

favor of Continental.  The 1997 Mortgage was duly recorded in the Herkimer County Clerk's

Office on July 29, 1997 at Book 758 of Mortgages at Page 398.  A UCC-1 financing statement

perfecting the 1997 Security Interest in favor of Continental was duly recorded on or around July

29, 1997.  Repayment of the amounts due under the 1997 Loan was insured by HUD.  The final

loan closing following the construction of the Adult Home Facility occurred on March 18, 1999.

19.    On June 30, 2005, FAH refinanced the balance due under the 1997 Note through

the Herkimer County Industrial Development Agency (the "HCIDA").  On that date, the HCIDA

issued Civic Facility Revenue Bonds, Series 2005A (GNMA Collateralized – Folts Adult Home

Project) in the amount of $7,630,000.00 and Taxable Civic Facility Revenue Bonds, Series

2005B (GNMA Collateralized – Folts Adult Home Project) in the amount of $255,000.00

(collectively, the "FAH Revenue Bonds").  FAH executed and delivered a new Mortgage Note in

the amount of $7,885,000.00 to GMAC Commercial Mortgage Bank, which provided for

2823158.1

monthly payments of principal and interest commencing on August 1, 2005 and continuing through March 1, 2040 (the "2005 Note"). FAH also executed and delivered a new Mortgage in favor of GMAC covering the Adult Home Facility and real property, which Mortgage was recorded with the Herkimer County Clerk's Office on July 6, 2005 at Book of Mortgages 1107, at Page 907 (the "2005 Mortgage"). GMAC also recorded a UCC-1 financing statement with the New York State Department of State on July 6, 2005, which perfected its first position security interest in FAH's personal property

20.      On or around December 9, 2009, GMAC, n/k/a Capmark Finance, Inc. (as debtor in possession), assigned the 2005 Mortgage Note, the 2005 Mortgage and related loan documents to Berkadia. FAH defaulted on its obligations under the 2005 Note as of February 2013, and has not made a payment since that date.

21.      On or around April 1, 2014, Berkadia assigned the 2005 Note, the 2005 Mortgage and related loan documents to Greystone Servicing Corporation, Inc. ("Greystone"). On or around July 1, 2016, Greystone exercised its rights under the loan documents to request that HUD honor its insured guaranty of payment and satisfy the outstanding amounts due under the 2005 Loan. In exchange for that payment, Greystone assigned all of its rights and interests in the 2005 Note, the 2005 Mortgage and related documents to HUD on or around July 28, 2016.

22.      As of the Petition Date, the principal sum of $7,218,934.41 is due HUD under the 2005 Note, plus interest and accrued fees totaling approximately $2,105,881.40, for a total indebtedness of approximately $9,324,815.81. Under the terms of the 2005 Note and 2005 Mortgage, HUD is in possession of funds previously paid by FAH into a Replacement Reserve Account totaling $161,170.72. There is no Sinking Fund Account under the 2005 Note or 2005 Mortgage.

2823158.1

## B. Pre-2013 Financial Difficulties

23.     From late 2004 through October 12, 2012, the Debtors were operated by Chief

Executive Officer Ralph Reid ("Reid") and Chief Operating Officer Ernest Orts ("Orts").

During that time, Messrs. Reid and Orts also operated two other skilled nursing facilities in the

Mohawk Valley area: Mohawk Valley Nursing Home, Inc. in Utica and Countryside Care Center

in Delhi.

24.     Throughout their tenure, Messrs. Reid and Orts were involved with irregular

financial dealings and mismanagement at all three nursing homes which included, among other

things, the use of intercompany accounts to transfer funds from one facility to another as cash

needs arose and the falsification of books and records to disguise the transactions.  This practice

ultimately resulted in Mohawk Valley Nursing Home filing a chapter 11 petition for relief in

2008 (NDNY Case No. 08-60303), the closure of Countryside Care Center in October, 2012 and

the Debtors being left in financial distress.

25.     Unbeknown to the Folts Home and FAH Boards of Directors (the "Boards"),

Messrs. Reid and Orts maintained two sets of books and records at Folts Home and FAH,

routinely provided the Board members with false monthly financial statements showing that

obligations to taxing authorities and vendors had been paid and deflected the Board members'

questions concerning the financial status of the Facilities by assuring them that all obligations

were current.  In actuality, federal withholding taxes totaling approximately $700,000.00 had not

been paid for the fourth quarter of 2011 and first three quarters of 2012, state withholding taxes

and unemployment taxes totaling approximately $70,000.00 and $30,000.00, respectively, had

not been paid, utility payments to National Grid were seriously in arrears and numerous vendors

8

2823158.1

were threatening legal action.  The extent of irregularities was discovered in late September 2012

and both Mr. Reid and Mr. Orts were fired effective October 12, 2012[3].

## C. <u>The Receiverships</u>

26.    The Debtors struggled to address their financial situation during early 2013, but

were unable to continue operating without additional assistance.  On or around June 2013, the

Debtors sent a letter to the New York State Department of Health ("DOH") requesting the

voluntary appointment of a financial receiver to operate the Facilities.  The Boards thereafter

interviewed several prospective receivers and ultimately selected Upstate Service Group, LLC

("Upstate") to act as the receiver for both Facilities, primarily because Upstate expressed an

interest in purchasing the Facilities and continuing the Debtors' mission of providing skilled

nursing care in the Herkimer area.  The DOH thereafter approved and authorized Upstate's

receivership pursuant to the terms of two Receivership Agreements dated October 1, 2013.

27.    Two affiliates of Upstate, FRNC, LLC and FCADH, LLC, took over the

operations of the Folts Home and FAH Facilities, respectively, as receivers on October 1, 2013

pursuant to two Receivership Agreements signed by the DOH, the Debtors and Upstate October

1, 2013 (the "Upstate Receivership Agreements").  Pursuant to the Upstate Receivership

Agreements, Upstate entered into possession of the Facilities, including the real property,

personal property and all of the Folts Home's and FAH's accounts, and was vested with all of the

Folts Home and FAH assets to be held in trust for them (Upstate Receivership Agmt, ¶ 1.7).  All

items of personal and real property were made available to Upstate to the extent of the Debtors'

possessory interest therein, including the use of the premises.  In addition, for the duration of the

receiverships, Upstate was authorized to use Folts Home's and FAH's accounts receivable to

---

[3] In fact, Mr. Reid and Mr. Orts were arrested on March 15, 2016 and charged with second-degree grand larceny and first-degree falsifying business records in connection with the theft of nearly $66,000.00 from the resident trust account at the Countryside Care Center between December 2006 and October 2012.

2823158.1

operate the Facilities for its own account and be responsible for the profit and losses of the business conducted at the Facilities (*Id.* at ¶ 5.0). Upstate was responsible for all payables accrued during its tenure, but was not responsible for any liabilities incurred by Folts Home or FAH prior to the commencement date of the receiverships. *Id.* at ¶ 1.7. Any funds remaining in Upstate's possession at the conclusion of the receiverships are the property of Folts Home and FAH. Finally, the DOH issued Operating Certificates to Upstate for the Facilities and Folts Home and FAH surrendered their operating certificates.

28.     In furtherance of its proposal to acquire the Facilities, Upstate engaged in discussions with HUD concerning the proposed purchase price and the treatment of the two HUD-insured mortgages. Unfortunately, the parties could not reach a satisfactory agreement concerning the purchase terms, and the Boards were forced to seek a new purchaser and substitute receiver during late January and early February 2014.

29.     By March 2014, the Boards identified The HomeLife Companies, Inc. of Delaware, Ohio ("HomeLife") as the potential new receiver. On April 17, 2014, the Boards entered into an Asset Purchase Agreement with HomeLife pursuant to which HomeLife would acquire the Facilities and the adjoining parcel improved by the old mansion house ("the HomeLife APA"). The HomeLife's obligation to acquire the Facilities under the APA was conditioned upon its negotiating an acceptable mortgage claim treatment with HUD and obtaining the approval of HUD, the DOH and the New York Attorney General to the proposed transaction.

30.     HomeLife thereafter submitted the required character and competency documents to the DOH to be approved as receiver. On November 1, 2014, the DOH, HomeLife and the Debtors signed Receivership Agreements pursuant to which HomeLife at Folts, LLC and

10

2823158.1

HomeLife Folts-Claxton, LLC were appointed the substitute receivers of Folts Home and FAH, respectively. The HomeLife receiverships actually commenced on February 14, 2015, following the DOH's final approval of the HomeLife Receivership Agreements. The Upstate receiverships terminated on February 13, 2015.

31.    The HomeLife Receivership Agreements contain essentially the same terms as set forth in the Upstate Receivership Agreements described above. HomeLife holds the Facilities' assets in trust for the Debtors and operates them for HomeLife's own account, and is responsible for paying the liabilities incurred during its tenure as receiver. Any surplus funds remaining in HomeLife's operating account become the Debtors' property upon the termination of the HomeLife receiverships. As of the Petition Date, the DOH is in the process of extending the term of HomeLife's receiverships through August 1, 2017.

32.    At the conclusion of its receiverships, Upstate determined that, after paying all liabilities that accrued during the its receiverships in accordance with the terms of the Upstate Receivership Agreements, Upstate had accrued a surplus of funds belonging to Folts Home and FAH totaling $761,297.61. In order to determine the proper recipient(s) of the funds, on July 1, 2015, Upstate commenced an interpleader action in the United States District Court for the Northern District of New York (Case No. 6:15-cv-00812-GLS/TWD) against HomeLife, the Debtors, HUD, the Internal Revenue Service and several of the Debtors' judgment creditors (the "Interpleader Action"). By Orders dated October 28, 2015 and December 23, 2015, FRNC, LLC deposited funds totaling $734,711.58 with the District Court Clerk on behalf of Folts Home, and by Order dated March 14, 2016, FCADH, LLC deposited $26,586.03 with the Court Clerk on behalf of FAH. The Interpleader Action remains pending as of the Petition Date.

2823158.1

### D. **The Asset Purchase Agreements**

33.     The HomeLife APA was originally scheduled to expire on August 31, 2014.  In order to give HomeLife more time to negotiate with HUD and satisfy the contingencies in the APA, the Boards agreed to extend the expiration date of the APA three times, through its current expiration date of March 2, 2017.  HomeLife has advised the Debtors that it will be unable to close the proposed purchase under the HomeLife APA by March 2, 2017, which results in the termination of the HomeLife APA.

34.     During mid-2016, Upstate contacted HUD regarding its renewed interest in acquiring the Facilities.  Upstate negotiated with HUD during the latter part of 2016 and reached a deal in principal with HUD during December 2016 which called for the sale of the Facilities to Upstate for $9,500,000.00, plus HUD's retention of the funds in the Folts Home Sinking Fund Account.  Upstate presented a proposed Purchase Agreement to the Debtors on or around December 29, 2016.

35.     On February 10, 2017, Upstate submitted an executed Purchase Agreement to the Debtors, along with a deposit in the amount of $1,250,000.00.  Of that amount, $1,000,000.00 represents the purchase deposit under the Purchase Agreement and $250,000.00 is paid to the Debtors to enable them to commence and administer these chapter 11 proceedings in order to consummate the sale.  Shortly after the Petition Date, the Debtors will file a motion pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code seeking to, among other things, approve the form of the Purchase Agreement and Upstate as the stalking horse bidder for substantially all of the Debtors' assets, including the Facilities, and to sell the assets, subject to higher and better offers.

2823158.1

### E. **The Creditor Claims**

36.    As of the Petition Date, there are two categories of creditor claims associated with

the Facilities: (i) the unpaid claims accrued by Folts Home and FAH that arose prior to the

commencement of the receiverships on October 1, 2013 (the "Pre-Receivership Claims") and (ii)

the claims (mostly current accounts payable) accrued by HomeLife in its name in accordance

with the terms of the HomeLife Receivership Agreements (the "HomeLife Liabilities").

37.    The Pre-Receivership Claims include the two HUD mortgages totaling

approximately $15,498,899.92, liabilities to taxing authorities aggregating approximately

$1,000,000.00, unpaid cash receipts assessments and recoupment claims owed to the DOH

totaling approximately $3,700,000.00 and trade vendor claims totaling approximately

$2,000,000.00. The HomeLife Liabilities currently total approximately $285,902.38 on behalf of

Folts Home and $3,680.53 on behalf of FAH.

38.    The Debtors anticipate that HomeLife will continue to pay the HomeLife

Liabilities in the ordinary course of business using the receivables generated by its receiverships

and collected in connection with the operation of the Facilities. The Debtors will treat the Pre-

Receivership Claims in context of their chapter 11 cases.

39.    The Debtors seek relief under chapter 11 of the Bankruptcy Code to implement

the sale of the Facilities as going concerns pursuant to section 363 of the Bankruptcy Code, and

to address their numerous significant Pre-Receivership Claims. The Debtors seek this relief in

light of their financial inability to continue operating the Facilities, the fact that they have

encountered operating losses since 2011, and their desire to sell the Facilities to a qualified

purchaser who will protect the health, safety and welfare of the Folts Home and FAH residents

13

2823158.1

and preserve the Debtors' long-standing mission to provide quality residential healthcare to members of the Herkimer community.

<b><u>PART II - FIRST DAY MOTIONS</u></b>

**A.      <u>Application for Order Pursuant to Sections 327(a) of the Bankruptcy Code Authorizing the Retention of Bond, Schoeneck & King, PLLC as Attorneys for the Debtors and Debtors in Possession</u>**

40.      The Debtors have selected the law firm of Bond, Schoeneck & King, PLLC ("Bond") to act as their attorneys in connection with the prosecution of their chapter 11 cases.

41.      Due to Bond's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its specialized and substantial expertise in corporate, litigation, labor, real estate and healthcare law, we believe that Bond is highly qualified to assist the Debtors with the intricate legal issues likely to arise in these chapter 11 cases. Bond has also represented the Debtors during the pre-petition period since March 2013. As a result, we believe it is efficient and necessary to continue to utilize Bond's services.

42.      Prior to the Petition Date, the Debtors consulted extensively with Bond in respect to, among other things, the restructuring of their debts, the appointment of the receivers, interactions with HUD and the DOH, and the preparation, commencement and prosecution of these cases. Through such consultations, Bond has become familiar with the Debtors' businesses and legal affairs. Furthermore, the members and associates of Bond who will advise the Debtors in these cases have considerable knowledge and experience in the field of bankruptcy law and debtors' and creditors' rights, including insolvencies, restructurings and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to these chapter 11 cases.

2823158.1

43.     If retained, Bond will render the following services, without limitation, on the

Debtors' behalf:

(a)     advising the Debtors with respect to their powers and duties as debtors and
debtors in possession in the continued management and operation of their
businesses and assets;

(b)     attending meetings and negotiating with representatives of creditors and
other parties in interest, including HUD, DOH and the IRS, and advising
and consulting on the conduct of the cases, including all of the legal and
administrative requirements of operating in chapter 11;

(c)     taking all necessary action to protect and preserve the Debtors' estates,
including the prosecution of actions commenced under the Bankruptcy
Code on their behalf, and objections to claims filed against the estates;

(d)     preparing on behalf of the Debtors all motions, applications, answers,
orders, reports and papers necessary to the administration of the estates;

(e)     negotiating and preparing on the Debtors' behalf a plan of reorganization,
disclosure statement and all related agreements an/or documents and
taking any necessary action on behalf of the Debtors to obtain
confirmation of such plan;

(f)     advising the Debtors with respect to any sale of assets;

(g)     appearing before this Court, any appellate courts, and the U.S. Trustee,
and protecting the interests of the Debtors' estates before such courts and
the U.S. Trustee;

(h)     performing all other legal services in connection with these chapter 11
cases.

44.     As disclosed in the Affidavit of Stephen A. Donato, Esq., to be submitted in

support of the Application for Order Pursuant to Sections 327(a) of the Bankruptcy Code

Authorizing the Retention of Bond (the "Donato Affidavit"), other, non-bankruptcy attorneys at

Bond have in the past, and currently, perform unrelated labor work for Upstate and its affiliates.

Bond has obtained pre-petition conflict waiver letters from both Upstate and the Boards in

connection with these representations.

2823158.1

45.    Bond has indicated its willingness to act in this case as the Debtors' attorneys and to render the foregoing services.  The Debtors have agreed to pay Bond compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by Bond.  We believe the fees that Bond will charge the Debtors, as set forth in the Donato Affidavit filed in support of Bond's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and Bond's extensive experience and the scope of the work to be performed pursuant to this retention.

46.    We believe that Bond is well qualified to represent the Debtors as debtors in possession in these chapter 11 cases and that the retention of Bond is necessary and in the best interests of the Debtors, their estates and their creditors.  Accordingly, the Debtors respectfully request that the Court issue an Order approving the appointment of Bond to act as the attorneys to the Debtors herein.

**B.**    **Motion to Excuse Receiver from Delivering Property to the Debtors in Possession Pursuant to 11 U.S.C. § 543(d)**

47.    As stated above, on November 1, 2014, HomeLife at Folts, LLC and HomeLife at Folts-Claxton, LLC entered into the HomeLife Receivership Agreements with the Debtors and the DOH, the terms of which provide that HomeLife at Folts, LLC and HomeLife at Folts-Claxton, LLC were appointed receivers of the Facilities effective February 14, 2015.  Pursuant to the Agreements, HomeLife entered into possession of the Facilities, including the real property, personal property and all of the accounts.

48.    Residential healthcare facilities may only be operated by individuals or entities issued operating certificates by the DOH.  Upon becoming receiver in 2015, HomeLife was issued an operating certificate.  The Debtors' operating certificates were surrendered in October 2013, and may not be reissued without re-application and establishment of character and

16

2823158.1

competency.  Accordingly, in order to maintain the Debtors' operations during the post-petition

period, HomeLife has filed a motion seeking to excuse HomeLife from delivering the real and

personal property of the Facilities to the Debtors pursuant to section 543(d)(1) of the Bankruptcy

Code (the "Section 543 Motion").  Without the relief requested in the Section 543 Motion, the

Facilities would be required to close for lack of proper licensure.  The closure of the Facilities

would seriously diminish the value of the Debtors' assets inasmuch as the real properties are

single purpose facilities (nursing home and adult home) and their closure, even if intended only

to be temporary, may result in permanent closure.

49.     Upon information and belief, the Debtors own no other assets than those acquired

by HomeLife as receiver on February 14, 2015.  Pursuant to the HomeLife Receivership

Agreements, HomeLife has collected incoming payments from all sources and applied them to

the costs incurred in the performance of its functions as receiver.  It continues to operate the

skilled nursing facility and adult residential care facility.

50.     The HomeLife receiverships have been extended until August 1, 2017.  If excused

from turning over possession of the Facilities to the Debtors pursuant to section 543(d)(1) of the

Bankruptcy Code, HomeLife will comply with all operating guidelines and financial reporting

requirements and cooperate with the Debtors concerning the Chapter 11 Cases.

51.     We respectfully submit that the removal of HomeLife as receiver would not be in

the best interests of the Debtors' creditors or other interested parties.  The closure of the

Facilities would not only disrupt the lives of approximately 214 frail and elderly residents, but

would also seriously diminish the value of the Facilities by reason of the loss of the operating

certificate.  Accordingly, the Debtors respectfully request that the Court grant HomeLife's

2823158.1

motion and issue an order excusing HomeLife from turning over possession of the Facilities to

the Debtors pursuant to section 543(d)(1) of the Bankruptcy Code.

**C.      Motion for an Emergency Order (A) Authorizing the Debtors and Receivers to
Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (B) Authorizing the Debtors
and Receivers to Grant Adequate Protection to Prepetition Secured Parties
Pursuant to 11 U.S.C. §§ 361, 362, and 363, and (C) Scheduling Interim and Final
Hearings Pursuant to Bankruptcy Rule 4001**

52.      The Debtors filed a Motion requesting that this Court enter an emergency order

(a) authorizing the Debtors and Receivers to utilize cash collateral pursuant to section 363 of the

Bankruptcy Code, (b) authorizing the Debtors and Receivers to grant adequate protection to

prepetition secured parties pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and

(c) scheduling an interim hearing and a final hearing concerning the Motion pursuant to

Bankruptcy Rule 4001 (the "Cash Collateral Motion").  As I understand, by the Cash Collateral

Motion, the Debtors, through their receivers HomeLife, seek to use the cash collateral of their

prepetition secured parties which arise according to the transactions described below:

### i.      The HUD Loan Obligations

53.      As described in paragraphs 10 through 22 above, the Debtors each entered into a

pre-petition, HUD-insured secured loan transaction with commercial lenders pursuant to which

their Facilities and personal property were pledged to secure repayment of the obligations.

54.      Folts Home entered into the Folts Home Note dated as of February 25, 1993 (as

the same may have been amended, restated, supplemented or otherwise modified from time to

time) and related loan documents in connection therewith (as the same may have been amended,

restated, supplemented or otherwise modified from time to time, the "Folts Home Loan

Documents"), all of which were assigned to HUD on or around July 28, 2016.  Pursuant to the

Folts Home Loan Documents, HUD claims first priority liens on, and security interests in, all of

18

2823158.1

Folts Home's accounts, contract rights, general intangibles, chattel paper and documents, and the proceeds, products and recoveries of the foregoing (collectively, the "Prepetition Nursing Home Collateral").

55.    NYSMCFFA, as predecessor in interest to HUD, duly perfected its first position security interest in the Prepetition Nursing Home Collateral by filing a UCC-1 financing statements with the New York State Secretary of State  and Herkimer County on or around February 25, 1993, which have been continued by HUD through April 28, 2019.

56.    FAH entered into the 2005 Note (as the same may have been amended, restated, supplemented or otherwise modified from time to time) and related loan documents in connection therewith (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "FAH Loan Documents"), all of which were assigned to HUD on or around July 28, 2016.  Pursuant to the FAH Documents, HUD claims first priority liens on, and security interests in, all of FAH's accounts, contract rights, general intangibles, chattel paper and documents, and the proceeds, products and recoveries of the foregoing (collectively, the "Prepetition Adult Home Collateral").

57.    GMAC, as predecessor in interest to HUD, duly perfected its first position security interest in the Prepetition Adult Home Collateral by filing a UCC-1 financing statement with the New York State Secretary of State on July 6, 2005, which has been continued by HUD through April 28, 2019.

### ii.    Internal Revenue Service Tax Liens

58.    Prior to October 1, 2013 when Upstate took over the operations of the Facilities as receiver, the Debtors operated both the Nursing Home Facility and the Adult Home Facility out of a comingled operating account and paid their employees out of a comingled payroll account in

2823158.1

the name of Folts Home.  As a result, all of the employees, whether they were employed by Folts

Home or FAH, were paid from a single payroll account with checks issued by Folts Home.  Folts

Home, therefore, became liable for all withholding taxes and other payroll tax obligations for

both entities.

59.    As a result of the Debtor's failure to pay withholding taxes during the pre-

receivership period, the IRS filed tax liens against Folts Home beginning on February 11, 2013

(for the tax period ending 12/31/11) and again on June 3, 2013, June 11, 2013, March 25, 2014

and June 3, 2014 (for tax period ending on 6/30/12 through 12/31/13).

60.    Under sections 6323(c) and (d) of the Internal Revenue Code, the IRS may obtain

a priority lien on a debtor's accounts receivable and inventory 45 days after the filing of the

notice of federal tax lien.

61.    In these cases, the IRS may assert a priority lien position over the Debtors'

accounts receivable (they have minimal inventory) following the filing of the first tax lien on

February 11, 2013, and the secured lender, now HUD, may be subordinated to second position

since that date.

### iii. The NYS Department of Health Recoupment

62.    As an Article 28 Residential Health Care Facility in New York State, Folts Home

is required to pay an assessment on cash operating receipts (the "Cash Receipts Assessment") on

a monthly basis under the Health Facility Cash Receipts Assessment Program pursuant to

Chapter 1 of the Laws of 2002 (as amended).  Folts Home, through its receiver, currently pays

6.8% of its assessable cash receipts to the DOH under this Program.  Failure to pay the Cash

Receipts Assessment will result in the DOH asserting a possessory lien on a facility's

2823158.1

Medicare/Medicaid accounts receivable and withholding a portion of those ongoing

reimbursements due the facility.

63.    In addition to the Cash Receipts Assessment, Folts Home is periodically audited

by the Medicare program and the DOH to determine whether it has received the correct amount

of Medicare and Medicaid reimbursements based upon the number and type of residents actually

residing at the Nursing Home Facility during a given period.  Underpayments result in additional

funds paid to the Facility; an overpayment will result in a demand by Medicare or the DOH to

repay the excess funds.  The DOH retains a recoupment right to withhold a portion of the

ongoing reimbursements due the Nursing Home Facility in order to collect an overpayment.

64.    Prior to October 1, 2013, Folts Home had accrued unpaid Cash Receipts

Assessments and unpaid Medicare/Medicaid recoupments due the DOH totaling approximately

$3,100,000.00.  In addition, during late 2015, the Medicare program determined that Folts Home

received overpayments approximately $600,000 during 2012/2013.  Accordingly, as of the

Petition Date, Folts Home currently owes the DOH approximately $3,700,000.00 in Cash

Receipts Assessments and overpayment recoupments.  The DOH is currently withholding

approximately 5% of each Medicaid reimbursement (receivable) due Folts Home in order to

recover the outstanding amount due.

### iv.    The Debtors' Need to Use Cash Collateral

65.    HUD, the IRS and the DOH each assert liens covering the Debtors' cash and

accounts receivable (the "Prepetition Cash Collateral").  It is our belief that the Debtors and

HomeLife require the use of cash collateral to fund their day-to-day operations.  Indeed, absent

such relief, the Debtors' businesses will be brought to an immediate halt, with disastrous

consequences for the Debtors, their residents, their estates and creditors.  Accordingly, the

21

2823158.1

Debtors seek authority pursuant to section 363(c)(2) of the Bankruptcy Code to use the Prepetition Cash Collateral in the operation of their businesses and the administration of their chapter 11 cases. Neither of the Debtors has been able to obtain, in the ordinary course of their business, unsecured credit under section 503(b)(1) of the Bankruptcy Code as an administrative expense sufficient to meet their operating needs.

66.     The Debtors received consent from HUD, the IRS and the DOH in the form of an agreed emergency interim order to use the Prepetition Cash Collateral (the "Emergency Interim Order") in accordance with the Budget attached to the Emergency Interim Order as Exhibit "A." The Budget also serves as the Debtors' cash flow projection under Rule 2015-6(b)(3) of the Local Rules for the United States Bankruptcy Court for the Northern District of New York.

67.     In sum, without immediate access to the Prepetition Cash Collateral, the Debtors face a liquidity crisis that would threaten the viability of their businesses. If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of these cases, the Debtors will likely face a substantial, if not devastating, loss of community support and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of employees and employee morale and deteriorating relationships with suppliers and residents – all of which would adversely affect the value of the Debtors' businesses. Thus, the ability of the Debtors to remain viable operating entities, administer their cases under chapter 11 of the Bankruptcy Code, and preserve value pending a sale of their Facilities, depends upon obtaining the interim and final relief requested in this Motion.

2823158.1

**D.**    **Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 363(c)(1) Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, (III) Continued Use of Existing Business Forms and (IV) Continued Intercompany Transactions**

68.    A list of the bank accounts HomeLife maintains on behalf of the Debtors (collectively, the "Bank Accounts") is provided in Exhibit "A" attached to the Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 363(c)(1) Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued use of Existing Cash Management System, (III) Continued Use of Existing Business Forms and (IV) Waiver of Investment and Deposit Requirements (the "Bank Account Motion"). The Bank Accounts are held at JPMorgan Chase Bank (the "Bank") in Oneida, New York.

69.    As described in the Bank Account Motion, the Bank Accounts and receiver HomeLife's practices and procedures with respect to the collection of deposits, making disbursements and making payroll constitute the Debtors' centralized cash management system (the "Cash Management System"). HomeLife maintains several bank accounts that are integrated to form the Debtors' Cash Management System. HomeLife makes the majority of payments related to general operations from the Operating Account. Certain of the other accounts are designated as payroll accounts and resident trust accounts as indicated on Exhibit "A" to the Bank Account Motion.

70.    As described in the Section 543 Motion, under the HomeLife Receivership Agreements, HomeLife has taken possession of the Debtors' assets in trust and operates them for HomeLife's own account during the pendency of the receiverships. As such, HomeLife routinely incurs liabilities and pays them using the receivables generated and collected in connection with the operation of the Facilities. Since these liabilities are incurred in HomeLife's name, and not in the name of the Debtors, the Debtors request that HomeLife not be required to

23

2823158.1

instruct its Bank to stop payment on all outstanding checks issued to employees, vendors or other trade creditors on account of prepetition debts or liabilities, and that these checks be processed by the Banks in the ordinary course of business.

71.    Pursuant to the standard chapter 11 operating practice in this jurisdiction, the Debtors are required, among other things, to open new bank accounts upon the filing of the bankruptcy petitions and are further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.

72.    In light of the fact that the Debtors' Facilities and existing Cash Management System are operated by HomeLife, the Debtors submit that they should not be required to close and reopen new Bank Accounts and creating a new cash management system.  Such a requirement would not only force the Debtors and HomeLife to incur significant and unnecessary costs and expenses, but would create significant confusion about HomeLife's status and impair the operation of the Debtors' businesses.

73.    Indeed, forcing the Debtors and HomeLife to employ a new cash management system could diminish the prospects for a successful administration of the Chapter 11 Cases, disrupt payroll, introduce inefficiency at a time when efficiency is most critical, and place a strain on HomeLife's relationships with residents and vendors.  Naturally, these relationships must be maintained if the Debtors are to be given the opportunity to successfully administer their Chapter 11 Cases.  Asking residents and third-party payors to remit payments to new and different accounts will result in a significant slowdown in HomeLife's collection of receipts just at the time when prompt collection is most critical.  In addition, the Cash Management System is especially delicate in light of its reliance upon receivables from both Medicare and Medicaid.  A

24

disruption in HomeLife's ability to collect receivables from the Medicare and Medicaid could

take several weeks to correct and deny HomeLife and the Debtors much needed cash.

74.    Further, the preservation of the Bank Accounts will not adversely impact any of

the Debtors' creditors.  The Bank has been designated as Authorized Depositories by the Office

of the United States Trustee for the Northern District of New York (the "Authorized

Depositories").

75.    Integrally related to the Cash Management System is the continued existence of

the Bank Accounts.  The Debtors, their employees and vendors would suffer great hardship if the

Debtors and HomeLife are required to substitute new debtor in possession bank accounts for the

existing Bank Accounts.  By preserving business continuity and avoiding the operational and

administrative paralysis that closing the Bank Accounts and opening new ones would necessarily

entail, all parties in interest will be best served and the Debtors generally will benefit

considerably.

76.    Further, the Debtors also request permission for HomeLife to continue using the

existing business forms and stationery it created for the Debtors without alteration or change.

The Debtors and HomeLife do not print their own business forms and stationery.  Thus,

substantial time and expense would be required if the Debtors and HomeLife are required to

print new business forms and stationery merely to indicate "debtor in possession" postpetition.

77.    Finally, in the ordinary course of their businesses, HomeLife utilizes a cost

allocation system by which relevant expenses are allocated between Folts Home and Folts Adult

Home (the "Intercompany Transactions").  As a result of the Intercompany Transactions,

intercompany receivables and payables are created in the ordinary course of business (the

2823158.1

"Intercompany Claims").[4]  The Intercompany Transactions are sometimes settled by book entry

rather than by an actual transfer of cash.  HomeLife tracks all Intercompany Transactions in its

respective accounting systems and can ascertain, trace and account for them as needed.

Continuing these Intercompany Transactions and other intercompany services will benefit the

Debtors' estates.  If the Intercompany Transactions were to be discontinued, the Cash

Management Systems and related administrative controls would be disrupted to the detriment of

the Debtors.

**E.**     **Motion for Order (I) Authorizing the Debtors and Receivers to Pay Prepetition Wages, Salaries and Benefits, (II) Authorizing Continuation of Employee Benefit Programs in the Ordinary Course of Business and (III) Directing the Bank to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and Benefit Obligations.**

78.     To avoid the significant risks of resignations and of discontent or loss of morale

among essential employees, and in view of the priority awarded to wage claims, it is necessary

and appropriate that the Debtors and HomeLife be granted the requested authorization.  To that

end, the Debtors have filed a Motion for Order (I) Authorizing the Debtors and HomeLife to Pay

Prepetition Wages, Salaries and Benefits, (II) Authorizing Continuation of Employee Benefit

Programs in the Ordinary Course of Business and (III) Directing the Bank to Honor Prepetition

Checks for Payment of Prepetition Wage, Salary and Benefit Obligations (the "Wage Motion").

The Debtors require the continued service of their employees in order to ensure that the

continuity and quality of their business operations will not be threatened and so that the Debtors

---

[4] HomeLife, on behalf of the Debtors, engages in Intercompany Transactions on a regular basis to allocate shared services between the Debtors and such transactions are common among enterprises similar to the Debtors. The Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code. Nonetheless, out of an abundance of caution, the Debtors seek express authority for HomeLife to engage in such transactions on a post-petition basis.  The continued performance of the ordinary course Intercompany Transactions is integral to ensuring HomeLife's ability to operate the Debtors' businesses as debtors in possession.

2823158.1

may continue, without unnecessary interruption, their efforts to achieve a successful sale of the Facilities as going concerns.

79.     HomeLife currently employs approximately 240 active employees on behalf of the Debtors (the "Employees"). The Nursing Home Facility employs 124 full-time Employees, 60 part-time Employees and 34 individuals employed on a *per diem* basis. The Adult Home Facility employs 12 full-time Employees and 10 part-time Employees. None of the Employees are union members. The Employees are paid bi-weekly, in arrears. Based upon historical data, the average monthly payroll for the Employees is approximately $540,000.00. The Debtors are not-for-profit entities under New York State law and the members of their Boards of Directors are community volunteers. As such, no officers, stockholders or directors will receive payments from the Debtors during the 30-day period following the Petition Date.

80.     The most recent pay date for Employees was February 10, 2017 and covered the period of January 22 – February 4, 2017. As of the Petition Date, the accrued, unpaid payroll for all Employees since February 5, 2017 is approximately $212,142.86. All wages earned by the Employees prior to the Petition Date constitute prepetition wages which will be paid on February 24, 2017. Therefore, it is imperative that the Debtors and HomeLife obtain authorization to pay priority prepetition wage claims to Employees on February 24, 2017.

81.     All of the Employees are currently owed amounts that are under the $12,850.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

82.     The Debtors seek authority for HomeLife to pay accrued but unpaid prepetition wages due all Employees through the Petition Date. The Debtors seek to pay the prepetition wages for all Employees in the ordinary course when the first obligations come due on February 24, 2017, including obligations that are not yet due.

27

2823158.1

83.    In addition, in the ordinary course of its business, the Debtors, through HomeLife,

provide benefits to their Employees (collectively, the "Employee Benefits"). The Employee

Benefits to employees include, without limitation, health insurance, dental insurance, vision

insurance, paid time off, workers' compensation, disability insurance and related programs.

84.    The payroll and Employee Benefits for the employees for the above-mentioned

periods is less than $12,850.00 for each employee in nearly all circumstances. In the event that

any of the Employees seek payment of salary or Employee Benefits in excess of the $12,850.00

statutory cap, the Debtors will address such requests with an additional motion after consultation

with the Office of the United States Trustee and counsel to the committee of unsecured creditors,

if any.

85.    The Debtors further requests that this Court authorize JPMorgan/Chase Bank to

process, honor and pay all prepetition checks issued by, and fund transfer requests made from,

HomeLife with respect to employee wages and Employee Benefits that were not processed,

honored or paid as of the Petition Date.

86.    To the Debtors' knowledge, all Employees have been reimbursed for Business

Expenses previously incurred. The Employees submit receipts for reimbursement which are

processed through the normal expense report and accounts payable process. To the extent that

prepetition Business Expenses have been incurred by Employees but have not yet been submitted

for payment, the Debtors seek authority to pay all prepetition Business Expenses in the ordinary

course of business.

87.    Finally, HomeLife routinely withholds from Employee paychecks amounts that

HomeLife is required to transmit to third parties. Examples of such withholding include Social

Security, FICA, federal, state, and local income taxes, garnishments, health care payments and

2823158.1

charitable donations.  Such withheld funds, to the extent that they remain in HomeLife's

possession, constitute monies held in trust and, therefore, are not property of the Debtors'

bankruptcy estates.  We respectfully submit that HomeLife's practice of directing such funds to

the appropriate parties is in the ordinary course of business, and the Debtors seek authority to

continue such practice.

88.    The obligations for which the Debtors seek authorization to honor to the

Employees were earned by individuals employed on behalf of the Debtors, and are for services

rendered within one hundred and eighty (180) days before the commencement of the Debtors'

cases.  The obligations are for wages, including paid time off, and payroll taxes based on such

wages, and for the other Employee Benefits mentioned above.

89.    The relief requested pursuant to the Wage Motion will not prejudice creditors, but

rather will protect their interests.

**F.     Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing the
Debtors and Receivers to Pay Prepetition Sales and Withholding Taxes**

90.    We have reviewed the Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and

363(b) Authorizing the Debtors and Receivers to Pay Prepetition Sales and Withholding Taxes

(the "Tax Motion").  Based upon our review of the Tax Motion, we understand that the Debtors

are seeking an Order from the court authorizing, but not directing, HomeLife to pay prepetition

sales, use, payroll, trust fund and other taxes and similar obligations (collectively, the "Taxes")

to the respective authorities in the ordinary course of the Debtors' businesses.  Nothing contained

in the Tax Motion, however, would preclude the Debtors or HomeLife from contesting, in their

sole discretion, the validity and amount of any prepetition Taxes under bankruptcy or non-

bankruptcy law.

2823158.1

91.    HomeLife, as receiver for the Debtors, in the ordinary course of business, incurs various liabilities, including Taxes. The Taxes are paid to various taxing authorities (collectively, the "Taxing Authorities") on a periodic basis that is established for each particular tax. To our knowledge, HomeLife is current with respect to the payment of Taxes incurred during its tenure as receiver. To the extent that there are prepetition Taxes owed to the Taxing Authorities, the Debtors believe that such amounts are substantially in accordance with the quarterly amounts previously paid to the Taxing Authorities.

92.    While reserving the right to argue to the contrary in particular cases, we are informed that the Debtors and HomeLife generally do not have any legal or equitable interest in funds held to pay sales and withholding Taxes. Moreover, to the extent that these "trust fund" taxes and other amounts are collected from third parties and held for payment to the Taxing Authorities, we are informed that they are not property of the estate. The Debtors and HomeLife, therefore, generally have no equitable interest in funds collected and segregated to pay the Taxes.

93.    Prior to the Petition Date, HomeLife paid the Taxes as they became due to Taxing Authorities. Nothing contained in the Tax Motion should be construed as impairing, or should be deemed to impair, the Debtors' or HomeLife's right to contest the validity or amount of any Taxes that may be alleged to be due and the Debtors and HomeLife expressly reserve all of their rights with respect thereto.

94.    Further, we are informed that most, if not all, of the Taxes are entitled to priority status under the Bankruptcy Code. The Debtors' payment of the Taxes in the ordinary course of business, in all likelihood, will only affect the timing of the payments and not the amounts to be

2823158.1

received by such entities.  Therefore, we do not believe that other creditors and parties in interest will be prejudiced by such payment.

95.     Without question, we believe that the payment of the Taxes is necessary to avoid interruption of the Debtors' business activities.  A withholding of the payment of the Taxes likely would cause taxing and other authorities to conduct audits and other administrative proceedings, resulting in significant administrative burdens.  Prompt and regular payment of the Taxes will avoid these unnecessary government actions.

96.     Furthermore, authority to pay the Taxes is necessary to avoid subjecting HomeLife's and the Debtors' officers and directors to lawsuits during the pendency of these Chapter 11 Cases that would distract from the effort to successfully administer the Cases.  Many federal and state statutes provide that various Taxes constitute "trust fund" taxes for which officers and directors of the collecting entity may in certain circumstances be held personally liable.  To the extent any accrued Taxes were unpaid as of the Petition Date, the taxing and other authorities in such jurisdictions may attempt to enforce such personal liability provisions against certain of HomeLife's and the Debtors' officers and directors.  Such potential lawsuits would prove extremely distracting for HomeLife, the Debtors, and for the named officers and directors whose immediate and full-time attention to the operation of the Facilities is required.  We believe it is in the best interests of the Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions.

97.     We believe that granting the relief requested will enhance the likelihood of the successful administration of the Debtors' cases and the probability of maximizing the value of estate assets and, ultimately, the return to creditors.  Further, we believe that the timely payment of the Taxes is necessary, is in the best interests of the Debtors' estates and is highly beneficial to

2823158.1

the operation of the Debtors' businesses.  Accordingly, the Debtors seek authority for HomeLife

to pay, in its sole discretion, the Taxes to the relevant Taxing Authorities in the ordinary course

of business.

**G.**    **Motion for Entry of an Order Authorizing (I) Continuation of Various Insurance Policies, and (II) Authorizing Payment of Pre-Petition and Post-Petition Obligations in Respect Thereof**

98.    We have reviewed the Motion for Order Authorizing (I) Continuation of Various

Insurance Policies, and (II) Authorizing Payment of Pre-Petition and Post-Petition Obligations in

Respect Thereof (the "Insurance Motion").  We believe that, if the requested relief is not granted

and the Insurance Policies (discussed below) lapse or terminate, the Debtors will be unable to

continue their business operations, thereby endangering the administration of the Chapter 11

Cases and substantially harming all creditors.

99.    In the ordinary course of the Debtors' businesses, the Debtors and HomeLife

maintain various liability, property and other insurance (the "Insurance Policies") through private

insurance carriers.  The Insurance Policies include coverage for, among other things, workers'

compensation claims, general and professional liability, property damage, operation of vehicles,

and breach of officers' and directors' duties.  All of the Insurance Policies referenced above are

discussed more fully in the Insurance Motion and are essential to the ongoing operation of the

Debtors' businesses.

100.    The premiums for the Insurance Policies are determined annually and are paid by

the Debtors at policy inception or via installments through the policy term directly to the carriers

or a broker/agent.  As of the Petition Date, all premiums are current.

101.    Pursuant to the Insurance Policies, the Debtors and HomeLife may be required to

pay various deductibles or retention amounts depending upon the type of claim and insurance

2823158.1

policy involved. Under certain policies, the carriers may pay claimants and then invoice the

Debtors for any deductible. In such situations, the carriers may have prepetition claims against

the Debtors. As of the Petition Date, the Debtors do not believe there are any material

prepetition obligations owed to the carriers relating to deductibles but, out of an abundance of

caution, the Debtors seek authority to satisfy any such prepetition obligations.

102.    The natures of the Debtors' businesses and the extent of their operations make it

essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted

basis. The non-payment of any premiums, deductibles or related fees under the Insurance

Policies could result in one or more of the carriers terminating or declining to renew their

insurance policies or refusing to enter into new insurance policies with the Debtors in the future.

If the Insurance Policies lapse without renewal, the Debtors could be exposed to substantial

liability for personal and/or property damages, to the detriment of all parties in interest.

103.    In order for the Debtors and HomeLife to maintain their operations in compliance

with various legal and contractual obligations, the Debtors must be able to continue their

Insurance Policies without disruption. In addition, as directed by the Office of the United States

Trustee for the Northern District of New York, debtors in chapter 11 cases have a fiduciary

obligation and a legal duty to account for their operations of a business, which in part is met

"substantially" by "obtaining and maintaining insurance" following the Petition Date. The

continuation of the Insurance Policies and the payment of all prepetition and post-petition

insurance obligations are therefore essential to preserve the Debtors' businesses and preserve the

value of the Debtors' estates for all creditors. We therefore respectfully request that the Court

grant the relief requested in the Insurance Motion in its entirety.

2823158.1

**H.      Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 507(a) and 541 Authorizing Debtors and Receivers to (i) Honor Certain Prepetition Obligations to Residents of its Facilities, (ii) Continue to Honor Resident Refunds, and (iii) Maintain Resident Trust Fund Accounts and Policies**

104.    We have reviewed the Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 507(a) and 541 Authorizing Debtors and Receivers to (i) Honor Certain Prepetition Obligations to Residents of its Facilities, (ii) Continue to Honor Resident Refunds, and (iii) Maintain Resident Trust Fund Accounts and Policies (the "Resident Fund Motion"). Based upon our understanding of the Resident Fund Motion, we understand that the Debtors are seeking an Order from the Court authorizing HomeLife, in its discretion and business judgment, to (i) honor certain prepetition obligations to residents of Folts Home and FAH (the "Residents"); (ii) continue to honor refunds owed to the Residents; and (iii) maintain certain resident trust fund accounts and policies for Residents, in the ordinary course of business, notwithstanding that such activities may result in the satisfaction of certain prepetition obligations to Residents.

105.    It is our belief that the Resident Fund Motion is crucial to preserve the important relationship between the Debtors and the Residents. Regardless of the Residents' official status as "creditors" of the Debtors, is critical that HomeLife, as the receiver and operator of the Facilities, be permitted to continue, at its discretion and in its business judgment, the resident trust fund policies in order to comply with applicable regulatory requirements, maintain the confidence and trust of Residents and their families, and generate much-needed revenue during the Debtors' cases. The Debtors and HomeLife seek to treat the Residents as non-creditors with whom they intend to transact business in the ordinary course.

106.    HomeLife at Folts, LLC, as the receiver and operator of Folts Home, provides inpatient skilled nursing care, rehabilitative services and other health-related and residential services to residents of the 163-bed Nursing Home Facility. HomeLife at Folts, LLC is a

2823158.1

participating provider in the federal Medicare program and the New York State Medical

Assistance Program ("Medicaid").  HomeLife at Folts-Claxton, LLC, as the receiver and

operator of FAH, provides residential living services to the residents of the 80-bed Adult Home

Facility.

107.    In the ordinary course of operating the Facilities, HomeLife and the Debtors are

subject to certain federal and New York state statues and regulations applicable to Residents'

payments, refunds and deposits.  Their compliance with these laws is facilitated by certain

internal practices and policies under which HomeLife promptly refunds amounts owed to

Residents and holds certain funds of Residents in segregated accounts.  Specifically, these

internal practices and policies apply to (a) Medicaid eligibility refunds, (b) overpayment refunds

and (c) maintaining trust fund accounts for Residents (collectively, the "Resident Trust Fund

Policies").

108.    It is our belief that the relief requested herein is necessary in the face of

uncertainty and concerns that follow the chapter 11 filing.  HomeLife must honor the refunds

owed to Residents and maintain the Resident Trust Fund Policies in order to fulfill its obligations

under federal and New York law and to engender the confidence and trust of Residents and their

families.  We believe that maintaining the Resident Trust Fund Policies and honoring refunds

during the pendency of these cases will inspire the goodwill of Residents and their families and

will generate cash flow needed for the reorganization.  In addition, these activities will enhance

the Debtors' competitive position by facilitating the retention of existing Residents and

encouraging new residents to apply for admission.  Conversely, failing to follow the Resident

Trust Fund Policies will hurt the Debtors' sale effort and expose the Debtors and HomeLife to

regulatory fines and other sanctions by government agencies.

2823158.1

109.    We are informed that the funds on deposit in the Resident Trust Fund Accounts are owned by the Residents and segregated from HomeLife's operating funds and bank accounts at JPMorgan Chase Bank.  Accordingly, we are informed that the funds in the Resident Trust Fund Accounts are generally not property of HomeLife or the Debtors' estates and, in accordance with HomeLife's and the Debtors' fiduciary and legal duties, the Resident Trust Fund Accounts should be maintained in accordance with the practices in effect as of the Petition Date.

110.    It is our belief that continuing to issue Medical Eligibility Refunds and Overpayment Refunds, and otherwise maintaining the Resident Trust Fund Policies would assist in the Debtors' operations and is in the best interests of the Debtors, their estates, the Residents and their families.  The Debtors' creditors will also benefit from the relief sought herein, because such relief will preserve and enhance the Debtors' ability to generate revenue.

**[The remainder of this page is intentionally left blank]**

2823158.1

We swear, under penalty of perjury under the laws of the United States of America, that

the foregoing is true and correct to the best of our knowledge, information and belief.

_____
Anthony E. Piana, DDS

Sworn to before me this
_____ day of February, 2017.

_____
Notary Public

TIMOTHY D. GURAL
Notary Public, State of New York
Qualified in Onondaga Co. No. 4984137
My Commission Expires July 5, 2020

_____
James H. Morey

Sworn to before me this
14th day of February, 2017.

_____
Notary Public

Sandra M. Ryan
State of Florida
MY COMMISSION # FF 185512
Expires: December 28, 2018